UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

DARRYL E. CARTER,                          :

                    Plaintiff,             :

     -against-                             :     11 Civ. 2517 (RA)(HBP)

MICHAEL J. ASTRUE,                         :     REPORT AND
Commissioner of Social Security                  RECOMMENDATION
                                           :
                    Defendant.
                                           :
----------------------------------X


          PITMAN, United States Magistrate Judge:


          TO THE HONORABLE RONNIE ABRAMS, United States

District Judge,


I.   Introduction


          Plaintiff, Darryl E. Carter, brings this action

pursuant to section 205(g) of the Social Security Act ("Act"), 42

U.S.C. § 405(g), seeking judicial review of a final decision of

the Commissioner of Social Security ("Commissioner") denying his

application for disability insurance benefits ("DIB") under Title

II of the Act.

          The Commissioner has moved for judgment on the

pleadings pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure (Docket Item 14).  For the reasons set forth below, I

respectfully recommend that judgment on the pleadings be granted in favor of the Commissioner.

II.  <u>Background</u>

    A.  <u>Procedural Background</u>

       Plaintiff filed an application for disability benefits on November 21, 2005, alleging he had been disabled since March 13, 2004 (Tr.[1] 11, 56).  Plaintiff described his disability as follows:  "I'm told that there's a possibility that I have an enlarged heart, high blood pressure, asthma, HIV and slipped disk" (Tr. 72-73).  The Social Security Administration denied plaintiff's application for benefits, finding he was not disabled, and plaintiff timely requested and was granted a hearing before an Administrative Law Judge ("ALJ") (Tr. 410-20). The ALJ, Jerome Hornblass, conducted a hearing on January 31, 2008 at which plaintiff, with his attorney present, testified (Tr. 410-20).  In a decision dated March 28, 2008, ALJ Hornblass found that plaintiff was not disabled and was not, therefore, entitled to benefits (Tr. 385-95).  On November 7, 2008, the Appeals Council remanded the matter (Tr. 24-29), and on July 2,

---

    [1] "Tr." refers to the administrative record that the Commissioner filed as part of its answer, as required by 42 U.S.C. § 405(g).

2009, a supplemental hearing was conducted by ALJ Margaret L. Pecoraro at which plaintiff, appearing <u>pro</u> <u>se</u>, again offered testimony (Tr. 421-49).  ALJ Pecoraro issued a decision denying plaintiff benefits on October 8, 2009, which became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on November 10, 2010 (Tr. 4-20).

Plaintiff commenced this action challenging the Commissioner's decision on April 6, 2011 (Docket Item 2).  On January 31, 2012, the Commissioner moved for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure, arguing that the Commissioner's decision was "legally correct and supported by substantial evidence" (Docket Item 14; Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings, dated January 31, 2012 (Docket Item 15)("Def.'s Mem."), at 1).  On November 15, 2012, after nearly a year without any activity by plaintiff, I issued an Order that stated:

> On January 31, 2012, defendant moved for judgment on the pleadings, seeking an order affirming the denial of plaintiff's application for disability benefits.  To date, plaintiff has not submitted any opposition.  Although I shall consider defendant's motion on the merits and not grant it on default, the absence of any opposition makes it substantially more likely that defendant's motion will be granted and the denial of benefits affirmed.

3

Accordingly, if plaintiff wishes to oppose defendant's motion, he is directed to submit his opposition to my chambers in writing no later than December 3, 2012; plaintiff is also directed to mail a copy of any opposition papers to counsel for defendant. After December 3, 2012, I shall consider the motion to be fully submitted and ripe for decision.

(Docket Item 17).  A copy of this Order was mailed to plaintiff at 617 Cassanova Street, Apt. 1-B, Bronx, New York 10474. Nevertheless, plaintiff has submitted no opposition to defendant's motion nor had he communication with my chambers in any other way.  Accordingly, I consider the defendant's motion fully submitted.

B.   Plaintiff's
     Social Background

Plaintiff was born on September 20, 1964 (Tr. 69).  He attended school through either 9th or 10th grade and does not have a GED (Tr. 77, 428).  Plaintiff lives alone, and his only income comes from the HIV/AIDS Services Administration, which pays his rent and provides him with food stamps (Tr. 428-30).

Plaintiff's past work experience includes being a cashier, stock person, maintenance worker, construction worker, and nurse's assistant (Tr. 73-74, 79, 82-83).  Most recently, from 1999 to 2003, plaintiff worked at a Pathmark supermarket, where he variously performed the duties of a cashier, stock

person, maintenance worker, and frozen goods worker (Tr. 74).
This job required standing and walking throughout the day, as
well as frequently lifting up to 25 pounds (Tr. 73-74, 79, 82-
83).

During the relevant time period, plaintiff was also an
active member of his church.  In a letter dated February 19,
2006, Elder Geraldine E. Rouse, the pastor of plaintiff's church,
states that plaintiff "often volunteer[ed] to help with ushering,
cooking, cleaning and assisting seniors up and down two flights
of stairs, and assuring their safety home" (Tr. 108).  The letter
also remarks that plaintiff "work[ed] with our youths at the
church, and ha[d] shown his love to them by diligently helping
them with various problems and activities" (Tr. 108).  Elder
Rouse also noted that plaintiff was "one of our church's
custodians and [was] compensated by the church's free-will love
offerings" (Tr. 108).

C.   Plaintiff's
     Medical Background

1.   Harlem Hospital Center

During the relevant time period, plaintiff received
nearly all of his medical treatment at Harlem Hospital Center
("HHC").  The record reflects that plaintiff was diagnosed with

HIV in September 2002 (Tr. 274).  Notes from HHC during 2002 and 2003 indicate that plaintiff suffered from symptoms of depression and anxiety, including alcohol abuse, resulting in non-compliance with his antiretroviral HIV medications (Tr. 109-23, 233-293). On March 22, 2004, plaintiff met with physician's assistant Jarrett Kaczmarski at HHC, who restarted him on his antiretroviral treatment after a period of non-compliance (Tr. 228, 231-32).  On April 5, 2004, plaintiff reported "good compliance" and "no [significant] side effects" from the medication (Tr. 228).  Plaintiff visited the emergency room at HHC as a result of his asthma on May 3, 2004 (Tr. 368-69).

On June 9, 2004, plaintiff visited the HHC infectious disease clinic (Tr. 205).  He had "no new health complaints" aside from stiffness in his lower back which "improve[d] with activity" (Tr. 205).  Plaintiff reported using a nebulizer at night for his asthma (Tr. 205).  His HIV was noted as being "stable," and his CD4 count[2] was greater than 300 (Tr. 205).

---

[2] "Immune compromise is monitored by serial CD4 counts; viral replication, by plasma HIV RNA assay (viral load). Indications for starting antiretroviral therapy are the appearance of symptoms of opportunistic infection, decline of the CD4 count below 500/mm3, or viral load exceeding 5000 copies/mL." Stedman's Medical Dictionary at 38-39 (27th ed. 2000) ("Stedman's")

Plaintiff saw PA Kaczmarski again on August 17, 2005
(Tr. 329). PA Kaczmarski noted that plaintiff's CD4 count was
257 and that his HIV had been untreated since March 2005 (Tr.
329). Plaintiff complained of a dry cough, "predominantly at
night," and stated that he was still smoking (Tr. 329).
Plaintiff also reported that he was sleeping and eating well (Tr.
329). A physical examination was normal (Tr. 330). PA
Kaczmarski assessed plaintiff as positive for depression and loss
of appetite (Tr. 329-30). PA Kaczmarski renewed plaintiff on his
asthma and cholesterol medications, stressed the importance
quitting smoking, but did not renew treatment of plaintiff's
antiretroviral regimen, since plaintiff's HIV was asymptomatic
(Tr. 331). At a follow-up appointment on September 7, 2005,
plaintiff's CD4 count remained at 257, and PA Kaczmarski noted
that plaintiff had "coexisting substance abuse issues" (Tr. 332).
PA Kaczmarski also noted that plaintiff's living environment
afforded him no privacy, as he was then living with his
girlfriend and two children, and that this "fe[d] a lot of his
anger and frustration contributing to [his] anxiety/depression"
(Tr. 332).

On November 14, 2005, plaintiff had another appointment
with PA Kaczmarski (Tr. 210). Plaintiff's CD4 count was 224 (Tr.
210). He reported "feeling well" but complained of "increased

7

cough production in the morning" (Tr. 210).  Plaintiff stated
that he smoked one to two packs of cigarettes per day (Tr. 210).
PA Kaczmarski noted that plaintiff's HIV was symptomatic,
prescribed him a trial of Diflucan for thrush,[3] and "[d]iscussed
initiating therapy" if plaintiff's CD4 count remained low (Tr.
210).  Plaintiff's asthma was described as "stable," and he was
also referred to orthopedics for treatment for spinal stenosis[4]
(Tr. 210).  On December 6, 2005, PA Kaczmarski noted that
plaintiff was "ready to restart" his antiretroviral therapy (Tr.
337).  Plaintiff's CD4 count was 187 (Tr. 337).  He reported a
"persistent cough productive of purulent sputum [] for the last
three weeks with wheezing" (Tr. 337).  PA Kaczmarski restarted
plaintiff on his HIV treatment and prescribed him medication for
bronchitis (Tr. 337).  At a follow-up visit on December 20, 2005,
PA Kaczmarski stated that plaintiff was "[t]olerating medications
well," and that despite some "sluggishness in the morning,"
plaintiff wished to continue with the treatment (Tr. 339).

---

[3] Thrush is an "[i]nfection of the oral tissues with Candida
albicans; often an opportunistic infection in humans with AIDS or
humans suffering from other conditions that depress the immune
system; also common in normal infants who have been treated with
antibiotics." Stedman's at 1832.

[4] "Spinal stenosis is narrowing of the spinal column that
causes pressure on the spinal cord, or narrowing of the openings
(called neural foramina) where spinal nerves leave the spinal
column."  Spinal Stenosis - PubMed Health, http://www.ncbi.nlm.
nih.gov/pubmedhealth/PMH0001477/ (last visited Jan. 18, 2013).

On January 3, 2006, plaintiff saw PA Kaczmarski, who remarked that plaintiff was "tolerating [his] medications well" (Tr. 217).  PA Kaczmarski also noted that plaintiff was still using tobacco and smoked one to two packs per day (Tr. 217). Plaintiff saw PA Kaczmarski again on January 23, 2006, who noted that plaintiff has a "good virological response to [his HIV] treatment" (Tr. 342).  Plaintiff reported independence in his activities of daily living (Tr. 342).  PA Kaczmarski stated that plaintiff did "not wish to stop tobacco use" (Tr. 342).

In a letter to the Department of Family Services dated January 27, 2006, PA Kaczmarski stated that plaintiff was being treated for "multiple chronic medical conditions" (Tr. 134).  PA Kaczmarski wrote that plaintiff was HIV positive and that he was experiencing fatigue, diarrhea and insomnia (Tr. 134).  Regarding plaintiff's asthma, he stated that plaintiff required "daily medication therapy and nebulizer treatments for frequent exacerbations" (Tr. 134).  PA Kaczmarski also stated that plaintiff suffered from "chronic low back pain with radicular complaints attributable to spinal stenosis and [found] it difficult to sit/stand for any prolonged period" (Tr. 134).

On February 10, 2006, plaintiff met with Dr. Oladipo Alao, complaining of "fever, chills, cough, nausea, vomit[ing] and diarrhea" (Tr. 344).  Dr. Alao, after noting that plaintiff's

9

AIDS was stable, diagnosed plaintiff with "viral

syndrome/bronchitis" and prescribed the following: (1) "Zitrhomax

Z pak as directed," (2) "Use proventil 2 puffs (or machine)

[every four hours], alternate with Atrovent," (3) "Flovent

inhaler 2 puffs [twice daily]," (4) Motrin 400mg every six hours

as needed, (5) Imodium 2mg as needed "after loose bowel

movement," and (6) "increase fluids and rest" (Tr. 345).

On February 14, 2006, a computed tomography ("CT") scan

of plaintiff's lumbar spine was conducted (Tr. 326).  The scan

showed "no evidence for frank disc herniation, acute fracture or

dislocation," but did show a "[m]inimal circumferential

discogenic[5] bulge . . . at the level of L. 3/4, L4/L5, L5,S1"

(Tr. 326).  It was further noted that "[f]acet joints and lamina

demonstrate[d] hypertrophy[6] at all levels" (Tr. 326).  Dr.

Smiljan Puljic stated his impression of "[d]egenerative

spondylytic changes," but noted "no acute pathology" (Tr. 326).

On that same date, plaintiff underwent an MRI of his lumbar spine

(Tr. 131).  Dr. Eric A Lubin's impressions based on the MRI were

as follows:

-------

[5] Discogenic disorders are those "originating in or from an
intervertebral disk." Stedman's at 508.

[6] Hypertrophy is a "[g]eneral increase in bulk of a part or
organ, not due to tumor formation." Stedman's at 857.

1.   Concentric bulging of disc at L4-5.  This deforms
     the anterior margin of the thecal sac and
     contributes to bilateral foraminal effacement.
     There is impingement upon both L4 nerve roots.

2.   Degenerative disc disease at L2-3, and L3-4.

3.   Mild spondylosis[7] at all levels of the lumbar
     spine.

(Tr. 131).

A Psychiatric Review Technique form, completed by Dr.
M. Apacible on February 16, 2006, indicates that plaintiff
suffered from "Impairment(s) Not Severe," within the category of
"12.04 Affective Disorders" (Tr. 135).

On March 22, 2006, plaintiff met with PA Kaczmarski for
a routine follow-up examination (Tr. 346).  PA Kaczmarski noted
that although plaintiff stated that he "has had thrush in the
past," he had "no health complaints to speak about today" (Tr.
346).  PA Kaczmarski also stated that plaintiff had a history of
depression, but that it was "controlled and untreated at this
time" (Tr. 346).

On April 10, 2006, plaintiff had another routine
follow-up examination with Dr. Alao (Tr. 350).  Plaintiff

---

    [7] Spondylosis is "[a]nkylosis of the vertebra; often applied
nonspecifically to any lesion of the spine of a degenerative
nature;" ankylosis is "[s]tiffening or fixation of a joint as the
result of a disease process, with fibrous or bony union across
the joint."  Stedman's at 90, 1678.

11

reported "wak[ing] up feeling sluggish," sleeping poorly, and
"occasional episodes of diarrhea/lo[o]se stools" (Tr. 350).  Dr.
Alao noted "positive right shoulder pain, pain with external
internal rotation" (Tr. 350).  Dr. Alao stated that plaintiff's
AIDS was "virologically suppressed" and continued him on his
then-current HIV medications (Tr. 351).  Plaintiff's asthma was
noted as being "stable" (Tr. 351).  Dr. Alao increased
plaintiff's dosage of pravastatin, a cholesterol medication, to
60mg every night before bedtime (Tr. 351).  Regarding plaintiff's
shoulder pain, Dr. Alao prescribed a trial of naprosyn, and
recommended an x-ray and a neurosurgery follow-up for spinal
stenosis (Tr. 351).  Dr. Alao further prescribed a muscle
relaxant to help plaintiff sleep (Tr. 351).

On May 1, 2006, plaintiff visited the neurosurgery
clinic, reporting pain in his legs but no other new neurological
symptoms (Tr. 198).  The doctor reviewed "all surgical options"
with plaintiff and plaintiff was scheduled for spinal surgery
(Tr. 198).  On May 8, 2006, at a follow-up appointment, PA
Kaczmarski noted that plaintiff intended to have surgery to
correct his herniated disc, "pending medical clearance" (Tr.
352).

PA Kaczmarski completed a Pulmonary Residual Functional
Capacity Questionnaire on June 8, 2006 (Tr. 136).  He diagnosed

12

plaintiff with "moderate/persistent" asthma (Tr. 136).  PA
Kaczmarski checked boxes indicating that the precipitating
factors for plaintiff's asthma included upper respiratory
infection, exercise, emotional upset/stress, irritants and cold
air/change in weather (Tr. 136).  Although PA Kaczmarski stated
that plaintiff would have "daily" asthma attacks, he remarked
that plaintiff's asthma was "well controlled" when plaintiff was
complaint with his medications (Tr. 137).  PA Kaczmarski stated
that plaintiff's pain or other symptoms would "occasionally" be
severe enough to interfere with the attention and concentration
needed to perform simple work tasks (Tr. 137).  He further stated
that plaintiff's asthma symptoms were due to plaintiff's
"reluctance to avoid precipitating factors (e.g. smoking)" (Tr.
137).

          Regarding plaintiff's functional limitations, PA
Kaczmarski stated that plaintiff could walk only one to two city
blocks before needing rest or experiencing severe pain (Tr. 138).
He further stated that plaintiff could sit or stand for 45
minutes at a time, and was limited by his spinal stenosis (Tr.
138).  He noted that plaintiff would only be able to sit and
stand or walk less than two hours total in an eight-hour workday,
and would need to take unscheduled breaks (Tr. 138).  PA
Kaczmarski also noted that plaintiff was capable of lifting less

than 10 pounds frequently, 10 pounds occasionally, 20 pounds
rarely, and would never be capable of lifting 50 pounds (Tr.
138).  According to PA Kaczmarski, plaintiff was capable of
twisting and climbing stairs frequently, stooping occasionally,
and crouching or squatting and climbing ladders rarely (Tr. 138).
He recommended that plaintiff avoid concentrated exposure to
extreme cold and heat, high humidity, and wetness, and also
avoid even moderate exposure to cigarette smoke, perfumes,
soldering fluxes, solvents or cleaners, fumes, odors, gases, dust
and chemicals (Tr. 139).  PA Kaczmarski noted that the number of
days plaintiff would potentially be absent from work depended on
his degree of compliance with the treatment recommended for him
(Tr. 139).  He concluded by noting that plaintiff also suffered
from "chronic low back pain and stiffness" and was "being
considered" for possible surgery (Tr. 139).

        A document entitled "Report of Treating Physician,"
dated June 9, 2006, and completed by "Jarrett Kaczmarski, MD"
also appears in the record (Tr. 140).  PA Kaczmarski stated that
plaintiff received treatment every month from November 1999
through May 8, 2006 for symptoms that included "chronic low back
pain accompanied by early A.M. stiffness" (Tr. 140).  He further
described "bulging [at] L 3/4, L 4/5, L5/S1, lamina/facet joint
hypertrophy" and noted that a lumbar CT scan had disclosed

14

"[d]egenerative spondylytic changes" (Tr. 141).  He diagnosed

spondylosis, and stated that plaintiff was "exploring surgical

intervention" (Tr. 141).  PA Kaczmarski also noted that

plaintiff's "symptoms improved with activity" (Tr. 142).  On that

same date, PA Kaczmarski completed a "Physical Capacities

Evaluation," in which he stated that plaintiff could lift and

carry up to 10 pounds occasionally, and five pounds frequently

(Tr. 143).  PA Kaczmarski further stated that plaintiff could

stand and/or walk less than two hours per day, sit less than six

hours per day, and would have pushing and pulling limitations in

his lower extremities due to his lower back pain (Tr. 143).

On June 12, 2006, x-rays of plaintiff's chest were

taken (Tr. 327).  They showed "no radiographic evidence of acute

pulmonary disease" and "mild cardiomegaly[8]" (Tr. 327).

Plaintiff was cleared for surgery (Tr. 327).

On July 17, 2006, plaintiff met with PA Kaczmarski, who

wrote that plaintiff had "no new health complaints" and that he

was scheduled for back surgery on August 13, 2006 (Tr. 356).  PA

Kaczmarski also noted that plaintiff's AIDS was virologically

suppressed (Tr. 357).

---

[8] Cardiomegaly is "[e]nlargement of the heart."  Stedman's
at 290.

On August 14, 2006, plaintiff again met with PA
Kaczmarski, who noted that plaintiff was "considering canceling
[the] procedure on [his] back," though his symptoms persisted
(Tr. 358).  At a follow-up appointment on September 12, 2006,
plaintiff reported that he was suffering from a cough and
congestion, but that all other symptoms were unremarkable  (Tr.
361).

On October 31, 2006, plaintiff met with PA Kaczmarski,
who reported that plaintiff had "no new health complaints" and
that he was "sleeping and eating well" (Tr. 362).  PA Kaczmarski
stated that plaintiff had chosen not to proceed with his back
surgery and that he had requested physical therapy (Tr. 363).
Further follow-up appointments on November 28 and December 19,
2006 were unremarkable (Tr. 364-68).

For a period of several weeks from approximately
February 5 through March 29, 2007, plaintiff attended bi-weekly
physical therapy sessions for his back problems (295-308, 313-
15).  The record indicates that during these sessions, plaintiff
was able to tolerate between 40 and 55 minutes of therapy without
distress (Tr. 300, 305-08, 313).

On April 16, 2007, Dr. Maria Rivera stated that
plaintiff continued to have symptoms of persistent lower back
pain, despite the physical therapy (Tr. 314).  Plaintiff was

16

fitted for a corset (Tr. 314).  Dr. Rivera also noted that both
of plaintiff's lower extremities were within normal functional
limits and that "[m]otor testing [was] no less than 5/5 in most
[musculoskeletal] groups" (Tr. 314).  On April 30, 2007,
plaintiff reported that he was "grateful and happy" with the
corset and was experiencing less pain (Tr. 315).

On May 15, 2007, plaintiff had another routine follow-
up appointment at which he reported "no new health complaints"
aside from "mild nausea" from his AIDS medication and
"generalized muscle aches" (Tr. 316).  A physical examination of
plaintiff was normal and his asthma was "stable" (Tr. 316).
Plaintiff's CD4 count and viral load were also tested, and the
results, delivered the next day, were slightly below the normal
ranges (Tr. 182).

At another appointment on June 5, 2007, plaintiff
complained of "allergic like symptoms for the past week" (Tr.
319).  He stated that he still occasionally experienced muscle
aches, but that they were "not as bad as they ha[d] been" (Tr.
319).  Plaintiff's AIDS was "virologically suppressed" and his
asthma was "stable" (Tr. 320).  Regarding plaintiff's back, Dr.
Tjark Schliep noted that "conservative measures ha[d] failed" and
referred plaintiff to pain management (Tr. 320).  Plaintiff was

also diagnosed with high blood cholesterol and given a referral for nutritional counseling (Tr. 320).

On September 26, 2007, plaintiff met with Dr. Aliya Haider (Tr. 321). Plaintiff stated that he had "no new complaints," was "100% compliant" with his AIDS medications, and that he had "missed the appointment for pain management" (Tr. 321). A physical exam was normal (Tr. 321). Dr. Haider chose to continue plaintiff on his current HIV medications and diagnosed his asthma as "stable" (Tr. 322). Dr. Haider also again referred plaintiff for pain management to address his back pain (Tr. 322). Laboratory results dated September 27, 2007 show that plaintiff's CD4 was 502, within the normal range (Tr. 184).

Plaintiff met again with Dr. Haider on December 12, 2007 (Tr. 323). Plaintiff reported that he was taking ibuprofen for his back pain, which was providing "partial relief," and that he had not followed up on the referral for pain management (Tr. 323). He stated that he was still "100% compliant" with his AIDS medication (Tr. 323). Plaintiff had twisted his right wrist and was experiencing pain and mild swelling, but a physical exam was otherwise normal (Tr. 323). Dr. Haider assessed plaintiff as experiencing "mild viremia[9]" as a result of his HIV, and

---

[9]  Viremia is "[t]he presence of a virus in the
(continued...)

continued him on his medication (Tr. 324).  His asthma was
assessed as "stable" (Tr. 324).  He was sent for an x-ray of his
wrist, and was also referred for physiotherapy for his back pain
(Tr. 324).  Plaintiff's wrist x-ray showed "no evidence of acute
fracture or dislocation," but small cysts in his carpal bones and
ulnar styloid meant that arthritis could "not be excluded" (Tr.
328).

Plaintiff met with Dr. Schliep on February 20, 2008,
who reported that plaintiff had no new complaints and that his
CD4 count was greater than 500 (Tr. 324).  He continued plaintiff
on his antiretroviral therapy (Tr. 325).

On January 22, 2009, plaintiff met with Dr. Robert
Holtzman in the neurosurgery department at HHC, complaining of
"low back pain and neck pain with some radiculation pain to his
arms" (Tr. 178).  An MRI of plaintiff's cervical spine "show[ed]
degenerative changes with mild effacement of the ventral
subarachnoid space at several levels including C3-4 and C4-5"
(Tr. 178).  An MRI of plaintiff's lumbar spine "show[ed]
straightening with loss of the lumbar lordosis[10] and mild disc

---

[9](...continued)
bloodstream."  Stedman's at 1963.

[10] Lumbar lordosis is "the normal, anteriorly convex
curvature of the lumbar segment of the vertebral column; lumbar
lordosis is a secondary curvature of the vertebral column,
(continued...)

bulging" (Tr. 178).  Dr. Holtzman recommended "physical therapy,
pain management and that [plaintiff] should join the YMCA and
learn to swim as the preferable exercise activity" (Tr. 178).

On July 16, 2009, PA Kaczmarski completed another
medical source statement regarding plaintiff's abilities to
perform work-related activities (Tr. 376).  He stated that
plaintiff could not lift or carry any weight (Tr. 376).  He also
wrote that plaintiff could not sit, stand or walk for more than
15-20 minutes at a time, and that plaintiff would also only be
able to sit, stand or walk for 15-20 minutes total in an eight-
hour workday (Tr. 377).  PA Kaczmarski also noted that plaintiff
did not require the use of a cane (Tr. 377).  Plaintiff could
"occasionally" use his hands for reaching, handling, pushing or
pulling, and "continuously" for fingering or feeling (Tr. 378).
PA Kaczmarski also found that plaintiff could "continuously"
operate foot controls (Tr. 378).  Regarding postural activities,
plaintiff could never climb ladders or scaffolds, would only
occasionally be able to climb stairs and ramps, stoop, kneel,
crouch and crawl, and would continuously be able to balance (Tr.
379).  Plaintiff's environmental limitations required that he

---

[10](...continued)
acquired postnatally as the upright posture is assumed when one
learns to walk."  Stedman's at 1032.

never be exposed to unprotected heights, moving mechanical parts, humidity and wetness, or dust, odors, fumes and pulmonary irritants (Tr. 380).  However, plaintiff could continuously operate a motor vehicle and be exposed to extreme cold and heat, as well as vibrations (Tr. 380).  Finally, PA Kaczmarski noted that plaintiff retained the ability to shop with assistance, ambulate without mechanical aid, walk short distances on rough or uneven surfaces, use public transportation, climb steps, prepare simple meals, care for his personal hygiene, and sort paper files (Tr. 381).

An undated letter written by PA Kaczmarski indicates that an MRI was performed on plaintiff's cervical and lumbar spine in January 2009 (Tr. 372).  According to PA Kaczmarski, the MRI of plaintiff's cervical spine "showed paracentral disc herniation at C2-C3, disc bulge at C3-C4, and straightening of the cervical spine which could be due to muscle spasm" (Tr. 372). The MRI of plaintiff's lumbar spine "showed severe straightening of the lumbar spine possibly due to muscle spasm, disc bulge at L4-L5" (Tr. 372).  PA Kaczmarski recommended that plaintiff continue with his medications, which included Naprosyn and flexeril, and to seek physical therapy (Tr. 372).

2.   Dr. Tranese's
<u>Consultative Examination</u>

On February 17, 2009, Dr. Louis Tranese performed a
consultative orthopedic examination on plaintiff (Tr. 160-63).
Plaintiff described his low back pain as "a daily persistent
activity[-]related crampy, throbbing, and stiff ache with
associated spasms and graded 7/10 baseline" (Tr. 160).  Plaintiff
"did not report radiation of his back pain into the legs, nor did
he report numbness, tingling, or weakness of the lower
extremities" (Tr. 160).  Plaintiff further stated that "his back
pain [was] aggravated with bending, sitting or standing [for]
long periods, uncomfortable positions, sudden movements such as
twisting, and heavy lifting" (Tr. 160).  Finally, plaintiff
reported that "[h]is pain [was] relieved with position changes,
rest, and prescription anti-inflammatory and muscle relaxant
medications" (Tr. 160).

Regarding plaintiff's social history, Dr. Tranese noted
that plaintiff had been a smoker since 1989, and continued to
smoke "two to three cigarettes per day" (Tr. 161).  With respect
to his activities of daily living, Dr. Tranese described
plaintiff as

> independent with cooking three times per week and
> cleaning twice per month.  He is able to perform
> laundry and shopping chores once per month. [Plaintiff]

22

is independent with daily showering, bathing, dressing,
and grooming.

(Tr. 161).

Dr. Tranese then conducted a physical examination of
plaintiff.  He found that plaintiff could walk without difficulty
and without any assistive device, that he could perform a full
squat, and that he needed no assistance during the examination
(Tr. 161).  Plaintiff's hand and finger strength was intact, and
his grip strength was "5/5 bilaterally" (Tr. 161).  His cervical
spine demonstrated "full flexion, extension, lateral flexion
bilaterally, and rotary movements bilaterally"; Dr. Tranese noted
no "cervical or paricervical pain or spasm," and "[n]o trigger
points" (Tr. 161).  Plaintiff's upper extremities were normal
(Tr. 162).  His thoracic and lumbar spines demonstrated
"[f]lexion [of] 75 degrees, extension [of] 0 degrees, and full
lateral flexion and rotary movements bilaterally" (Tr. 162).
Plaintiff complained of "bilateral lumbar parivertebral
tenderness, more so on the right than left," but did not
complaint of "[sacroiliac] joint or sciatic notch tenderness"
(Tr. 162).  Dr. Tranese found no palpable spasm and no scoliosis
or kyphosis (Tr. 162).  Additionally, a straight leg raise test
was negative bilaterally, and no trigger points were noted (Tr.
162).  Plaintiff's lower extremities were normal (Tr. 162).

23

Dr. Tranese diagnosed plaintiff with (1) "Chronic low back pain with reported history of lumbar disc herniation" and (2) "Reported history of hypertension and asthma" (Tr. 162).  Dr. Tranese offered the following medical source statement:

> [Plaintiff] may have mild to moderate limitations with frequent bending, and moderate limitations with heavy lifting.  He has mild limitations with frequent stair climbing or walking long distances, but he has no other physical functional deficits, in my opinion.

(Tr. 162).

D.   Proceedings
     Before the ALJs

ALJ Jerome Hornblass held plaintiff's first hearing, at which plaintiff was represented by an attorney, on January 31, 2008 (Tr. 410).  The transcript of plaintiff's first hearing is incomplete (see Tr. 410-420).  ALJ Hornblass issued an unfavorable decision on March 26, 2008 (Tr. 385-95).  After the Appeals Council remanded ALJ Hornblass's decision, a second hearing was conducted on July 2, 2008 before ALJ Margaret Pecoraro (Tr. 421-49).  Plaintiff, proceeding pro se, testified to the following facts at the second hearing.

Plaintiff first testified that he was 44 years old and that he had a ninth-grade education, with no GED or other vocational training (Tr. 428).  He stated that he lived alone,

and had last worked in 2002 (Tr. 428).  At his last job prior to
his period of alleged disability, which was at a grocery store,
plaintiff stated that he "did stock, maintenance, cashier . . .
basically everything there" (Tr. 428).  Plaintiff had held this
job, which was part time, for three years (Tr. 429).  Prior to
that job, plaintiff had worked at Brown's Children's Psychiatric
Center, essentially in the capacity of an orderly (Tr. 429A).
Plaintiff also testified that he had previously held jobs doing
construction and maintenance work (Tr. 429A, 430).

   Asked how he supported himself at the time of the
hearing, plaintiff stated that he received assistance from the
HIV/AIDS Services Administration[11] (Tr. 430).

   Plaintiff testified that "severe pain in [his] lower
and upper back" prevented him from working (Tr. 430).  He
testified that he was undergoing treatment for his back, which
included physical therapy about once a week (Tr. 431).  Plaintiff
stated that the physical therapy helped "[a] little bit -- not
much" (Tr. 431).  He further testified that he was taking several

---

[11] The HIV/AIDS Services Administration is an agency within
New York City's Human Resources Administration whose "mission is
to expedite access to essential benefits and social services
needed by persons living with AIDS or clinical symptomatic HIV
illness and their families."  HRA - HIV/AIDS Serices
Administration, http://www.nyc.gov/html/hra/html/directory
/hasa.shtml (last visited Jan. 18, 2013).

medications daily for the back pain, which included ibuprofen, Flexeril, and a muscle relaxer, but that they did not wholly alleviate his pain (Tr. 431-32). On a zero to ten scale, with ten being the most severe pain, plaintiff rated his back pain with the medications as a 5/10, and without as a 10/10 (Tr. 432). Plaintiff added that it was sometimes hard "to even get off the bed" (Tr. 432).

Plaintiff testified that he could sit for "15, 20 minutes tops," before getting "severe pain" that would "shoot down the back of [his] legs" (Tr. 432). He testified that his capacity to stand was "approximately the same," and that he could not walk more than "two or three blocks" without "severe pains" (Tr. 432-33). Regarding his ability to lift, plaintiff stated that he could lift "maybe a pillow," or "maybe five pounds at the most, if that" (Tr. 433). He also stated that he could lift a gallon of milk, but that his brother would help him when he went shopping (Tr. 433). Asked how he traveled, plaintiff testified that he took public transportation (Tr. 433).

Plaintiff testified that he occasionally would get muscle spasms in his back, and that the pain would "shoot down to [his] legs" and cause a sensation of numbness (Tr. 435). He stated that he wore a back brace, but that he would have to get a new one because he had gained weight (Tr. 435). Asked whether he

26

needed any assistive device to walk, plaintiff stated that PA Kaczmarski was going to "look into that" after his medical insurance was in order (Tr. 435).  He further testified that he was supposed to have back surgery in 2006, but it was cancelled due to lack of approval from the FDA (Tr. 435-36).

Plaintiff testified that he was diagnosed with HIV in 2001, but that is was currently "almost undetected" (Tr. 436). He stated that he took medications for the HIV, which sometimes caused constipation, diarrhea, and loss of appetite (Tr. 436). Plaintiff further stated that he had suffered no secondary infections from the HIV, and that it did not prevent him from doing anything (Tr. 437).

Asked if he had any other health problems, plaintiff testified that he had high cholesterol and asthma (Tr. 437). Regarding his asthma, plaintiff stated that "every now and then due to the weather" it affected him (Tr. 437).  He stated that he had visited the emergency room due to his asthma "maybe last year" when he "forgot to bring his pump with him" (Tr. 437-38). Plaintiff testified that his asthma was triggered by dust, smoke and fumes (Tr. 438).  He also testified that he needed to take his time on stairs because he lived two flights up, and that he would get "short of breath" (Tr. 438).

27

Asked how he spent his time, plaintiff testified that his grandchildren or relatives would occasionally visit him (Tr. 439).  He stated that he read the bible, that he took care of his own household chores, and that he cooked for himself (Tr. 440).  Plaintiff testified that he was active within his church, attending every Sunday and also on Wednesdays for Bible study, which lasted approximately an hour-and-a-half (Tr. 440).  He further testified that he was a deacon, and his responsibilities included assisting churchgoers to their seats and locking the church doors when services concluded (Tr. 440).

III. Analysis

    A.   Applicable Legal
        Principles

    1.   Standard of Review

The Court may set aside the final decision of the Commissioner[12] only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard.  42 U.S.C. § 405(g); Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Tejada

---

[12] The Appeals Council's decision constitutes a final decision of the Commissioner.  Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

v. Apfel, 167 F.3d 770, 773-74 (2d Cir. 1999); Bubnis v. Apfel,
150 F.3d 177, 181 (2d Cir. 1998).

       The Court first reviews the Commissioner's decision for
compliance with the correct legal standards; only then does it
determine whether the Commissioner's conclusions were supported
by substantial evidence. Tejada v. Apfel, supra, 167 F.3d at
773-74; Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987);
Ellington v. Astrue, 641 F. Supp. 2d 322, 327-28 (S.D.N.Y. 2009)
(Marrero, D.J.). "Even if the Commissioner's decision is
supported by substantial evidence, legal error alone can be
enough to overturn the ALJ's decision." Ellington v. Astrue,
supra, 641 F. Supp. 2d at 328; accord Johnson v. Bowen, supra,
817 F.2d at 986. However, "where application of the correct
legal principles to the record could lead to only one conclusion,
there is no need to require agency reconsideration." Johnson v.
Bowen, supra, 817 F.2d at 986.

       "The Supreme Court has defined substantial evidence as
'more than a mere scintilla' and as 'such relevant evidence as a
reasonable mind might accept as adequate to support a conclu-
sion.'" Quinones v. Chater, 117 F.3d 29, 33 (2d Cir. 1997),
quoting Richardson v. Perales, 402 U.S. 389, 401 (1971). "Conse-
quently, where [there is] substantial evidence . . . this Court
may not substitute its own judgment as to the facts, even if a

different result could have been justifiably reached upon de novo review." Beres v. Chater, 93 Civ. 5279 (JG), 1996 WL 1088924 at *5 (E.D.N.Y. May 22, 1996); see also Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).  Thus, "'[t]o determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight.'"  Terwilliger v. Comm'r of Soc. Sec., No. 3:06-CV-0149 (FJS/GHL), 2009 WL 2611267 at *2 (N.D.N.Y. Aug. 24, 2009), citing Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).

      2.  Determination of
          Disability

A claimant is entitled to disability benefits if he or she can establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see also Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (both impairment and inability to work must last twelve months).  The impairment must be

demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. § 423(d)(3), and it must be

> of such severity that [the claimant] is not only unable to do his previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [the claimant] lives, or whether a specific job vacancy exists for [the claimant], or whether [the claimant] would be hired if [the claimant] applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner must consider both objective and subjective factors when assessing a disability claim, including: (1) objective medical facts and clinical findings; (2) diagnoses and medical opinions of examining physicians; (3) subjective evidence of pain and disability to which the claimant and family or others testify; and (4) the claimant's educational background, age and work experience.  Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rivera v. Schweiker, 717 F.2d 719, 723 (2d Cir. 1983).

"In evaluating disability claims, the [Commissioner] is required to use a five-step sequence, promulgated in 20 C.F.R. §§ 404.1520, 416.920."  Bush v. Shalala, 94 F.3d 40, 44 (2d Cir. 1996).

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where . . . the claimant is not so engaged, the Commis-

31

> sioner next considers whether the claimant has a "se-
> vere impairment" that significantly limits his physical
> or mental ability to do basic work activities . . . .
> Where the claimant does suffer a severe impairment, the
> third inquiry is whether, based solely on medical
> evidence, he has an impairment listed in Appendix 1 of
> the regulations or equal to an impairment listed there
> . . . . If a claimant has a listed impairment, the
> Commissioner considers him disabled.  Where a claimant
> does not have a listed impairment, the fourth inquiry
> is whether, despite his severe impairment, the claimant
> has the residual functional capacity to perform his
> past work . . . . Finally, where the claimant is unable
> to perform his past work, the Commissioner then deter-
> mines whether there is other work which the claimant
> could perform.

Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); see also

Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003); Butts v. Barnhart,

388 F.3d 377, 383 (2d Cir. 2004), amended in part on other

grounds on rehearing, 416 F.3d 101 (2d Cir. 2005); Green-Younger

v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Shaw v. Chater,

supra, 221 F.3d at 132; Brown v. Apfel, supra, 174 F.3d at 62;

Tejada v. Apfel, supra, 167 F.3d at 774; Rivera v. Schweiker,

supra, 717 F.2d at 722.

Step four requires that the ALJ make a determination as

to the claimant's residual functional capacity.  See Sobolewski

v. Apfel, 985 F. Supp. 300, 308-09 (E.D.N.Y. 1997).  RFC is

defined in the applicable regulations as "the most [the claimant]

can still do despite [his] limitations."  20 C.F.R.

§§ 404.1545(a)(1), 416.945(a)(1).  To determine RFC, the ALJ

32

makes a "function by function assessment of the claimant's
ability to sit, stand, walk, lift, carry, push, pull, reach,
handle, stoop, or crouch . . . . " Sobolewski v. Apfel, supra,
985 F. Supp. at 309.  The results of this assessment determine
the claimant's ability to perform the exertional demands of
sustained work, and may be categorized as sedentary, light,
medium, heavy, or very heavy.  20 C.F.R. §§ 404.1567, 416.967;
see Rodriguez v. Apfel, 96 Civ. 8330 (JGK), 1998 WL 150981 at *7
n.7 (S.D.N.Y. Mar. 31, 1998) (Koeltl, D.J.).

        The claimant bears the initial burden of proving
disability with respect to the first four steps.  Burgess v.
Astrue, supra, 537 F.3d at 128; Green-Younger v. Barnhart, supra,
335 F.3d at 106; Balsamo v. Chater, supra, 142 F.3d at 80.  Once
the claimant has satisfied this burden, the burden shifts to the
Commissioner to prove the final step -- that the claimant's RFC
allows the claimant to perform some work other than the claim-
ant's past work.  Balsamo v. Chater, supra, 142 F.3d at 80; Bapp
v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986).

> In meeting [his] burden of proof on the fifth step of
> the sequential evaluation process described above, the
> Commissioner, under appropriate circumstances, may rely
> on the medical-vocational guidelines contained in 20
> C.F.R. Part 404, Subpart P, App. 2, commonly referred
> to as "the Grid."  The Grid takes into account the
> claimant's RFC in conjunction with the claimant's age,
> education and work experience.  Based on these factors,
> the Grid indicates whether the claimant can engage in

> any other substantial gainful work which exists in the national economy.

Gray v. Chater, 903 F. Supp. 293, 297-98 (N.D.N.Y. 1995) (Koeltl, D.J.).  When a claimant retains the RFC to perform at least one of the categories of work listed on the Grid, and when the claimant's educational background and other characteristics are also captured by the Grid, the ALJ may rely exclusively on the Grid in order to determine whether the claimant retains the RFC to perform some work other than his or her past work.  Butts v. Barnhart, supra, 388 F.3d at 383 ("In the ordinary case, the Commissioner meets his burden at the fifth step by resorting to the applicable medical vocational guidelines (the [Grid]).") (internal quotation marks and citation omitted).

However, "exclusive reliance on the [Grid] is inappropriate" where non-exertional limitations "significantly diminish [a claimant's] ability to work."  Butts v. Barnhart, supra, 388 F.3d at 383 (internal quotation omitted); Bapp v. Bowen, supra, 802 F.2d at 603.  When a claimant suffers from a non-exertional limitation such that he is "unable to perform the full range of employment indicated by the [Grid]," Bapp v. Bowen, supra, 802 F.2d at 603, or the Grid fails "to describe the full extent of [the] claimant's physical limitations," Butts v. Barnhart, supra, 388 F.3d at 383, the Commissioner must introduce the testimony of

a vocational expert in order to prove "that jobs exist in the
economy which the claimant can obtain and perform." <u>Butts v.
Barnhart</u>, <u>supra</u>, 388 F.3d at 383 (internal quotation marks and
citation omitted); <u>see</u> 20 C.F.R. § 1569a(d), pt. 404, subpt. P,
app. 2, § 200.00(e); <u>see also Heckler v. Campbell</u>, 461 U.S. 458,
462 n.5 (1983) ("If an individual's capabilities are not de-
scribed accurately by a rule, the regulations make clear that the
individual's particular limitations must be considered.").

        3.   <u>Treating Physician Rule</u>

        When considering the evidence in the record, the ALJ is
required to give deference to the opinions of a claimant's
treating physicians.  Under the regulations' "treating physician
rule," a treating physician's opinion will be given controlling
weight if it is "well-supported by medically acceptable clinical
and laboratory diagnostic techniques and is not inconsistent with
the other substantial evidence in . . . [the] record."  20 C.F.R.
§ 404.1527(d)(2); <u>Shaw v. Chater</u>, <u>supra</u>, 221 F.3d at 134; <u>Diaz v.
Shalala</u>, 59 F.3d 307, 313 n.6 (2d Cir. 1995); <u>Schisler v.
Sullivan</u>, 3 F.3d 563, 567 (2d Cir. 1993).

        Before an ALJ can give a treating physician's opinion
less than controlling weight, the ALJ must apply various factors
to determine the amount of weight the opinion should be given.

These factors include:  (1) the length of the treatment relation-
ship and the frequency of examination, (2) the nature and extent
of the treatment relationship, (3) the medical support for the
treating physician's opinion, (4) the consistency of the opinion
with the record as a whole, (5) the physician's level of special-
ization in the area and (6) other factors that tend to support or
contradict the opinion.  20 C.F.R. § 404.1527(d)(2)-(6); <u>Schisler</u>
<u>v. Sullivan</u>, <u>supra</u>, 3 F.3d at 567; <u>Mitchell v. Astrue</u>, 07 Civ.
285 (JSR), 2009 WL 3096717 at *16 (S.D.N.Y. Sept. 28, 2009)
(Rakoff, D.J.) (adopting Report and Recommendation of Freeman,
M.J.); <u>Matovic v. Chater</u>, 94 Civ. 2296 (LMM), 1996 WL 11791 at *4
(S.D.N.Y. Jan. 12. 1996) (McKenna, D.J.).  "[G]ood reasons" must
be given for declining to afford a treating physician's opinion
controlling weight.  20 C.F.R. § 404.1527(d)(2); <u>Schisler v.</u>
<u>Sullivan</u>, <u>supra</u>, 3 F.3d at 568; <u>Burris v. Chater</u>, 94 Civ. 8049
(SHS), 1996 WL 148345 at *6 n.3 (S.D.N.Y. Apr. 2, 1996) (Stein,
D.J.).

      B.    The ALJ's
           <u>Decision</u>

      The ALJ applied the five-step analysis described above,
relying on the medical evidence and plaintiff's testimony to
determine that plaintiff was not disabled (Tr. 11-20).

1.   Steps One
     Through Three

At step one, the ALJ found that plaintiff had not
engaged in substantial gainful activity since the alleged onset
date of his disability, March 13, 2004 (Tr. 14).

At step two, the ALJ found that plaintiff had the
following severe impairments through his last date insured:
lumbosacral disc disease, cervical disc disease, HIV infection,
and asthma (Tr. 14).

At step three, the ALJ found that none of plaintiff's
physical or mental impairments, either singly or in combination,
were severe enough to meet or medically equal the impairments
listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 14).

2.   The ALJ's
     RFC Determination

At step four, the ALJ discussed plaintiff's medical
records extensively and determined that plaintiff could perform
"light work," as defined by 20 C.F.R. § 404.1567(b),[13] as well as

---

[13] 20 C.F.R. § 404.1567(b) provides the following definition
of "light work":

    Light work involves lifting no more than 20 pounds at a
    time with frequent lifting or carrying of objects
                                          (continued...)

manipulate hand and leg controls (Tr. 14).  The ALJ also deter-
mined that plaintiff should avoid excessive exposure to respira-
tory irritants (Tr. 14).

With regard to determining whether there is substantial
evidence to corroborate an ALJ's RFC determination, the Second
Circuit recently provided following guidance in Campbell v.
Astrue, 465 F. App'x 4 (2d Cir. 2012):

> Although an ALJ's RFC determination "must be set forth
> with sufficient specificity to enable us to decide
> whether the determination is supported by substantial
> evidence," Ferraris v. Heckler, 728 F.2d 582, 587 (2d
> Cir. 1984), "we do not require that [the ALJ] have
> mentioned every item of testimony presented to him or
> have explained why he considered particular evidence
> unpersuasive or insufficient to lead him to a conclu-
> sion of disability," Mongeur v. Heckler, 722 F.2d 1033,
> 1040 (2d Cir. 1983); see also Miles v. Harris, 645 F.2d
> 122, 124 (2d Cir. 1981) (rejecting argument that the
> ALJ must explicitly reconcile every shred of conflict-
> ing testimony).

---

[13](...continued)
> weighing up to 10 pounds.  Even though the weight
> lifted may be very little, a job is in this category
> when it requires a good deal of walking or standing, or
> when it involves sitting most of the time with some
> pushing and pulling of arm or leg controls.  To be
> considered capable of performing a full or wide range
> of light work, [one] must have the ability to do
> substantially all of these activities.  If someone can
> do light work, we determine that he or she can also do
> sedentary work, unless there are additional limiting
> factors such as loss of fine dexterity or inability to
> sit for long periods of time.

Campbell v. Astrue, supra, 465 F. App'x at 6.  After reviewing the entire record, I find that the ALJ's RFC determination is supported by substantial evidence.

First, as emphasized by the ALJ, plaintiff's ability to perform light work is corroborated by the consultative findings of Dr. Tranese, whose examination revealed that plaintiff's impairments would cause him "mild to moderate limitations with frequent bending," "moderate limitations with heavy lifting," "mild limitations with frequent stair climbing and walking long distances," and that plaintiff had "no other physical functional deficits" (Tr. 162).  Such a report alone is enough to constitute substantial evidence.  See Fessler v. Astrue, 09 Civ. 6905 (WHP)(JCF), 2011 WL 346553 at *9 (S.D.N.Y. Jan. 10, 2011) (Francis, M.J)("Under 20 C.F.R. § 404.1527, not only may the reports of consultative or non-examining physicians constitute substantial evidence as to disability, but they may override the opinions of treating physicians in appropriate circumstances."), report and recommendation adopted, 09 Civ. 6905 (WHP)(JCF), 2011 WL 382973 (S.D.N.Y. Feb. 3, 2011) (Pauley, D.J.).  In addition, Dr. Tranese's findings are also consistent with the rest of plaintiff's medical records.

With respect to plaintiff's chronic low back pain and lumbar disk herniation, while the record discloses that plaintiff

39

did suffer some impairment of the spine, there is no objective
evidence of any totally debilitating impairments.  For example,
an MRI conducted in January 2009 showed only "mild effacement" in
plaintiff's cervical spine and "straightening with loss of the
lumbar lordosis and mild disc bulging" in the lumbar spine,
leading Dr. Holtzman to recommend only physical therapy and a
continuation of plaintiff's pain medications (Tr. 178).  While
plaintiff stated that these medications did not provide him
complete relief, they did partially alleviate his symptoms (Tr.
160, 431-32).  Indeed, in 2006, plaintiff chose not to proceed
with spinal surgery, instead opting to continue with physical
therapy and medication (Tr. 362).  In 2007, plaintiff was re-
ferred for pain management for his back problems on multiple
occasions and chose not to go (Tr. 321, 323).  At physical
therapy, he was able to tolerate between 40 and 55 minutes of
continuous therapy without any apparent distress (Tr. 300, 305-
08, 313).  And, as early as 2004, it was noted that plaintiff's
back symptoms improved with activity, an observation reiterated
by PA Kaczmarski in 2006 (Tr. 142, 205).

       The ALJ's determination as to the severity of plain-
tiff's spinal condition is also consistent with other evidence in
the record, including plaintiff's hearing testimony.  Plaintiff
testified that he was able to live almost entirely independently,

doing his own cooking and cleaning, and requiring only the
occasional assistance of his brother for shopping (Tr. 440).
Plaintiff was also active outside his home; the pastor of his
church wrote that he "often volunteer[ed] to help with ushering,
cooking, cleaning and assist[ed] seniors up and down two flights
of stairs, and assur[ed] their safety home" (Tr. 108).  Plaintiff
even performed custodial work for the church, for which he was
apparently compensated (Tr. 108).  It is worth noting that
janitorial work is classified as being "medium" exertional level
under Dictionary of Occupational Titles § 382.664-010.  Plaintiff
also attended church services and a weekly bible study group,
each of which required sitting for more than an hour (Tr. 440).

Plaintiff's other medical conditions also did not
prevent him from performing light work.  With respect to plain-
tiff's HIV, the condition was well-controlled with medication and
does not appear to have resulted in any secondary complications,
aside from a single report of thrush in November 2005 (Tr. 210).
At his hearing, plaintiff himself testified that his HIV was
nearly undetectable, and that it had little or no adverse impact
on is daily activities (Tr. 436-37).  Regarding plaintiff's
asthma, as the ALJ found, there is no evidence in the record
suggesting that plaintiff's asthma was debilitating; indeed, it
was described as "stable" throughout the relevant time period,

and seemed to be asymptomatic when plaintiff was compliant with his medications (see Tr. 137, 316, 320, 322, 324).  As the ALJ noted, the record suggests that any asthmatic symptoms were caused by plaintiff's failure to take his with asthma medications and his refusal to quit smoking.  Nevertheless, plaintiff did have asthma, and the ALJ's determination that plaintiff would be able to perform work that did not result in excessive exposure to respiratory irritants was a sensible and prudent compromise.  However, no more restrictive limitation is supported by the record.

Thus, because there is ample support in the record for plaintiff's capacity to meet the demands of light work with the asthma-related limitation discussed above, I find that the ALJ's RFC determination is supported by substantial evidence.

a.    PA Kaczmarski's
Medical Opinion

In determining plaintiff's RFC, the ALJ decided to give "little weight" to the opinions of PA Kaczmarski, who treated plaintiff throughout the relevant time period, and whose assessments of plaintiff's residual functional capabilities were far more limited than those made by Dr. Tranese (see Tr. 18).  This

determination was also proper and supported by substantial evidence.

Regarding the treating physician rule, PA Kaczmarski was a physician's assistant, not a physician, and thus not an "acceptable medical source" whose opinion was entitled to controlling weight under Social Securities regulations. 20 C.F.R. §§ 404.1513(a), 416.913(a); see also Genier v. Astrue, 298 F. App'x 105, 108 (2d Cir. 2008) ("[N]urse practitioners and physicians' assistants are defined as 'other sources' whose opinions may be considered with respect to the severity of the claimant's impairment and ability to work, but need not be assigned controlling weight."), citing 20 C.F.R. § 416.913(d)(1). Because PA Kaczmarski was properly classified as an "other source," the ALJ was not required to give his opinion controlling weight after applying the factors listed in 20 C.F.R. §§ 404.1527 and 416.927, and this is exactly what she did. See SSR 06-3p, 2006 WL 2329939 at *4-*5 ("Although the factors in 20 CFR 404.1527(d) and 416.927(d) explicitly apply only to the evaluation of medical opinions from 'acceptable medical sources,' these same factors can be applied to opinion evidence from 'other sources.'").[14]

---

[14] The factors identified in SSR 06-3p, which in turn are drawn from 20 C.F.R. §§ 404.1527 and 416.927, include:

(continued...)

Although the length of PA Kaczmarski's treatment of
plaintiff would ordinarily militate in favor of granting his
opinions probative weight, his RFC findings, i.e., that plaintiff
would be able to sit for only 20 minutes in an eight hour workday
and lift no weight at all (Tr. 376-77), are simply unsupportable.
First, the findings are belied by plaintiff's hearing testimony.
As discussed above, plaintiff testified that he was capable of a
wide range of activities, including cooking, cleaning, riding
public transportation, and partaking in various church-related
functions, which appear to require sitting for protracted periods
of time.  It is doubtful that these activities could be performed
by an individual with the restrictions PA Kaczmarski describes.

---

[14](...continued)
- How long the source has known and how frequently
  the source has seen the individual;

- How consistent the opinion is with other evidence;

- The degree to which the source presents relevant
  evidence to support an opinion;

- How well the source explains the opinion;

- Whether the source has a specialty or area of
  expertise related to the individual's
  impairment(s); and

- Any other factors that tend to support or refute
  the opinion.

SSR 06-3p, 2006 WL 2329939 at *4-*5.

PA Kaczmarski's opinions are also not supported by the medical records; in support of his restrictive RFC findings, Kaczmarski vaguely refers to plaintiff's "MRI reports" and his "subjective reports of pain (stiffness)" (Tr. 376-79). However, the most recent MRI reports in the record, from January 2009, showed mild degenerative changes in plaintiff's spine (Tr. 178), and nothing so severe as to serve as the basis for a finding of total disability without providing any further explanation. Indeed, after examining the results of plaintiff's January 2009 MRI, Dr. Holzman recommended, among other things, that plaintiff take up swimming, undermining PA Kaczmarski's opinion as to the apparent severity of the impairments (Tr. 178). As discussed above, the entirety of plaintiff's medical records were more consistent with the findings of Dr. Tranese, who found that plaintiff did suffer from certain limitations, but that those limitations were far short of being totally disabling. Thus, the ALJ's declining to afford controlling weight to the opinions and RFC findings of PA Kaczmarski was supported by substantial evidence.

> b.   Plaintiff's
>      Credibility

The ALJ also considered plaintiff's subjective complaints about his conditions in making his RFC determination. In

Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010), the Second
Circuit articulated the framework an ALJ must follow in weighing
the credibility of a plaintiff's subjective complaints when
making an RFC finding:

> When determining a claimant's RFC, the ALJ is required
> to take the claimant's reports of pain and other limi-
> tations into account, 20 C.F.R. § 416.929; see
> McLaughlin v. Sec'y of Health, Educ. & Welfare, 612
> F.2d 701, 704-05 (2d Cir. 1980), but is not required to
> accept the claimant's subjective complaints without
> question; he may exercise discretion in weighing the
> credibility of the claimant's testimony in light of the
> other evidence in the record.  Marcus v. Califano, 615
> F.2d 23, 27 (2d Cir. 1979).

> The regulations provide a two-step process for
> evaluating a claimant's assertions of pain and other
> limitations.  At the first step, the ALJ must decide
> whether the claimant suffers from a medically determi-
> nable impairment that could reasonably be expected to
> produce the symptoms alleged.  20 C.F.R. § 404.1529(b).
> That requirement stems from the fact that subjective
> assertions of pain alone cannot ground a finding of
> disability.  20 C.F.R. § 404.1529(a).  If the claimant
> does suffer from such an impairment, at the second
> step, the ALJ must consider "the extent to which [the
> claimant's] symptoms can reasonably be accepted as
> consistent with the objective medical evidence and
> other evidence" of record.  Id.  The ALJ must consider
> "[s]tatements [the claimant] or others make about [his]
> impairment(s), [his] restrictions, [his] daily activi-
> ties, [his] efforts to work, or any other relevant
> statements [he] make[s] to medical sources during the
> course of examination or treatment, or to [the agency]
> during interviews, on applications, in letters, and in
> testimony in [its] administrative proceedings."  20
> C.F.R. § 404.1512(b)(3); see also 20 C.F.R. §
> 404.1529(a); S.S.R. 96-7p.

Genier v. Astrue, 606 F.3d at 49.  Applying the two-part frame-
work, and referring specifically to SSR 96-7p, 1996 WL 374186,
the ALJ found that while plaintiff did "have some symptoms
resulting from his impairments . . . the intensity, frequency and
duration of his symptoms would not preclude light work" (Tr. 18).
This determination is also supported by substantial evidence.

        Plaintiff's testimony that he could sit or stand for
only "15, 20 minutes tops," before experiencing "severe pain," or
that he could only lift the weight of a pillow, was simply
inconsistent with his daily activities, which, as discussed
above, included cooking, cleaning, traveling on mass transporta-
tion, attending church services and performing various other
church duties (Tr. 432-33).  Plaintiff's testimony is also
inconsistent with Dr. Tranese's findings, which found, at best,
only moderate physical limitations (Tr. 161).  Thus, to the
extent the ALJ's RFC findings rested on his determination of
plaintiff's credibility, it was "within the discretion of the
[Commissioner] to evaluate the credibility of plaintiff's com-
plaints and render an independent judgment in light of the
medical findings and other evidence regarding the true extent of
such symptomatology."  Gernavage v. Shalala, 882 F.Supp. 1413,
1419 (S.D.N.Y. 1995) (Leisure, D.J.), accord Mimms v. Heckler,
750 F.2d 180, 186 (2d Cir. 1984); Richardson v. Astrue, 09 Civ.

1841 (SAS), 2009 WL 4793994 at *6 n.97 (S.D.N.Y. Dec. 14, 2009)
(Scheindlin, D.J.); see Aponte v. Sec'y, Dep't of Health & Human
Servs., 728 F.2d 588, 591 (2d Cir. 1984); Carroll v. Sec'y of
Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983) ("It is
the function of the [Commissioner], not [the reviewing courts],
to resolve evidentiary conflicts and to appraise the credibility
of witnesses, including the claimant.").

    3.  Step Five

        At the conclusion of step four, the ALJ found that
plaintiff would be unable to return to his past jobs, because
those jobs were of a "medium" exertional level and would exceed
his RFC (Tr. 19).  The ALJ stated that plaintiff, who was 39 at
the onset of his disability, was a "younger individual" for
purposes of the regulations (Tr. 19, citing 20 C.F.R. §§
404.1563, 416.965).  He also found that plaintiff had a limited
education and was able to communicate in English (Tr. 19, citing
20 C.F.R. §§ 404.1564, 416.964).  Given plaintiff's "younger age
and residual functional capacity," the ALJ found that transfer-
ability of job skills was not an issue (Tr. 19, citing 20 C.F.R.
§§ 404.1568, 416.968).  Citing these facts, the ALJ concluded
that there were jobs that existed in significant numbers in the

national economy that plaintiff would be able to perform (Tr. 19, citing 20 C.F.R. §§ 404.1569, 416.969).

As to plaintiff's non-exertional impairment, i.e., needing to avoid "excessive exposure to respiratory irritants," the ALJ found that that impairment would have "little or no effect on the occupational base of unskilled light work," (Tr. 19) and cited to Social Security Ruling 85-15, which states that "[w]here a person has a medical restriction to avoid excessive amounts of noise, dust, etc., the impact on the broad world of work would be minimal because most job environments do not involve great noise, amounts of dust, etc."  Social Security Ruling 85-15, Titles II and XVI: Capability to Do Other Work -- The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments ("Ruling 85-15"), 1985 WL 56857 at *1 (1985).

Accordingly, I conclude that the ALJ's determination that plaintiff was not disabled under the SSA is supported by substantial evidence in the record that was before him. Moreover, I find that the Commissioner applied the applicable law correctly.

49

IV.   Conclusion

        For all the foregoing reasons, I respectfully recommend
that the Commissioner's motion for judgment on the pleadings
pursuant to Rule 12(c) of the Federal Rules of Civil Procedure be
granted.

V.   OBJECTIONS

        Pursuant to 28 U.S.C. § 636(b)(1)(c)) and Rule 72(b) of
the Federal Rules of Civil Procedure, the parties shall have
fourteen (14) days from receipt of this Report to file written
objections.  See also Fed. R. Civ. P. 6(a).  Such objections (and
responses thereto) shall be filed with the Clerk of the Court,
with courtesy copies delivered to the Chambers of the Honorable
Ronnie Abrams, United States District Judge, 500 Pearl Street,
Room 620, and to the Chambers of the undersigned, 500 Pearl
Street, Room 750, New York, New York 10007.  Any requests for an
extension of time for filing objections must be directed to Judge
Abrams.  FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS **WILL** RESULT
IN A WAIVER OF OBJECTIONS AND **WILL** PRECLUDE APPELLATE REVIEW.
Thomas v. Arn, 474 U.S. 140, 155 (1985); United States v. Male
Juvenile, 121 F.3d 34, 38 (2d Cir. 1997); IUE AFL-CIO Pension

Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v.

Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Wesolek v. Canadair

Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714

F.2d 234, 237-238 (2d Cir. 1983).

Dated:  New York, New York
         January 22, 2013

                                  Respectfully submitted,


                                  _____
                                  HENRY PITMAN
                                  United States Magistrate Judge


Copies mailed to:

Mr. Darryl Carter
617 Cassanova Street
Apt. 1-B
Bronx, New York  10474

Leslie A. Ramirez-Fisher, Esq.
Assistant United States Attorney
Southern District of New York
3rd Floor
86 Chambers Street
New York, New York  10007